***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications; therefore, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant-employer was self-insured with Key Risk Management Services, Inc., serving as its third-party administrator.
3. An employer-employee relationship existed as of May 24, 1998 at the time plaintiff injured his neck and left arm. Defendant accepted liability for plaintiff's neck and left arm in I.C. File No. 875007 pursuant to a Form 60.
4. Plaintiff contends he suffered an injury by accident to his left foot and filed a claim under I.C. File No. 139563. Defendant has denied liability for this left foot injury. These matters were consolidated for decision at the deputy commissioner hearing.
5. Plaintiff's average weekly wage is $530.56.
6. The parties stipulated into evidence as Stipulated Exhibit 1, a packet of medical records.
7. The depositions of Dr. Walton Curl, Dr. Stephen Hsieh, Dr. A. Ritchie Lewis, Dr. Thomas S. Meloy, Dr. Alfred Rhyne, and Ms. Margie Trent, P.A. are a part of the evidentiary record in this case.
 ***********
Based on the evidence of record and the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the deputy commissioner hearing in this matter, plaintiff was thirty-six years old. Plaintiff has obtained a GED. Prior to working for defendant-employer, plaintiff was a case handler for approximately two years. Plaintiff then went to work for defendant-employer in 1984, but was laid off in 1985. Plaintiff returned to work with defendant-employer in 1985 as a rack stripper, a creeler, a glass winder, and a sliver handler. In 1995, plaintiff transferred to the buff shop. Plaintiff also worked in bobbin salvage and as a forklift and pallet jack operator.
2. On May 24, 1998, while working in the buff shop, plaintiff began to feel soreness in his shoulders and noticed some swelling. Plaintiff was restricted to no use of his left shoulder and arm until he could be seen by Dr. Hunter Strader, PPG's company physician.
3. Plaintiff saw Dr. Strader on June 9, 1998, complaining of left trapezius pain. On this date, plaintiff told Dr. Strader that there was nothing unusual about his work the day he began to suffer left shoulder and left trapezius pain. Plaintiff made no left foot pain complaints at this visit.
4. After plaintiff continued to experience pain, Dr. Strader referred plaintiff to Dr. Karl Bolstad in June 1998. Dr. Bolstad did not believe plaintiff's back pain was a workers' compensation problem, but thought plaintiff might be suffering from some type of muscle spasm.
5. Defendant accepted plaintiff's left shoulder and neck claim on a Form 60, Employer's Admission of Employee's Right to Compensation. Plaintiff remained at work, but was instructed not to continue to perform buffing as of June 1998. Over the next several months, plaintiff remained in the buff shop but was not performing any type of buffing, which would ordinarily require plaintiff to lean into a standing buffer to polish various pieces of equipment.
6. Plaintiff saw Dr. Christopher Nagy from June 30, 1998 through November 1998. Plaintiff complained of left foot pain to Dr. Nagy. Plaintiff saw Dr. Strader at PPG during this same time period yet did not list any complaint of left foot pain to him or anyone else at PPG during this time period.
7. Dr. Nagy ordered an MRI of plaintiff's spine which revealed a disc spur at C6-7. Plaintiff's disc spur was not impinging on the disc and there was no disc herniation. Plaintiff was subsequently referred to Dr. John Wilson for a neurological evaluation. Meanwhile, plaintiff continued to remain at work.
8. On October 7, 1998, plaintiff presented to Dr. Wilson with full range of motion of his neck without any pain. Dr. Wilson assessed plaintiff with "muscular related pain without any clear evidence on MRI of any nerve root or neurostructural impairment." Dr. Wilson released plaintiff to return to work full duty.
9. Plaintiff continued to work in the buff shop without missing any time. On December 8, 1998, plaintiff saw his family physician, Dr. Randy Long. Plaintiff told Dr. Long that he had experienced foot pain "for the last two months." Based upon this report, the genesis of plaintiff's foot pain began in October 1998, four months after he had last performed any buffing in the buff shop.
10. Plaintiff was referred to the Rowan Regional Medical Center for a trigger point injection by Dr. Kevin Speight. The injection failed to provide plaintiff with any relief. Plaintiff was then referred to physical therapy. Plaintiff continued to work at PPG throughout his treatment with Dr. Speight.
11. In an effort to evaluate plaintiff's continued pain complaints, PPG referred plaintiff for a functional capacity evaluation. The FCE of plaintiff revealed possible symptom magnification and disability exaggeration behaviors. The FCE also indicated plaintiff gave "a very poor effort not necessarily related to pain." Plaintiff was then placed in the sliver handler position, something which plaintiff believed he could perform.
12. In August 1999, plaintiff's pain complaints continued and he was referred to the Functional Restoration Program at Wake Forest University Baptist Hospital. Plaintiff verbalized a great deal of anger and distrust during his program interview. Plaintiff gave complaints of left hand and arm pain that increased with use, but did not mention his left foot or any pain associated with the foot. During the rehabilitation interview, plaintiff expressed distrust of the medical system and of physical therapy in general. Plaintiff refused to discontinue any medication if accepted into the program. Plaintiff indicated he would not lift more than he felt comfortable during any testing to be done. As a result of these positions, plaintiff was denied admittance into the program.
13. Plaintiff continued to complain that something had to be wrong with him, despite the lack of objective findings and despite the fact that he had lost no time from work. Plaintiff requested a second opinion and was referred to Dr. Walton Curl in November 1999. For the first time, plaintiff complained to a physician that he had injured not only his neck in May 1998, but his left foot as well. Dr. Curl diagnosed plaintiff with a "chronic cervical strain." There was no evidence of muscle spasms in November 1999 when plaintiff saw Dr. Curl.
14. Dr. Curl again referred plaintiff to the functional restoration program at Baptist Hospital. Plaintiff saw Dr. Spillman, who noted that plaintiff was "angry with his employer" and "demonstrated" resistance to compliance with the program. For instance, plaintiff refused to sign any forms. Plaintiff also stated that he would not work at any faster pace than he deemed appropriate and said that he would continue to take whatever medicines at night "as he sees fit." Plaintiff's actions and refusals were unreasonable.
15. Based upon plaintiff's refusal to abide by the guidelines, Dr. Spillman did not admit plaintiff into the functional restoration program. However, Dr. Spillman did release plaintiff to return to "medium" work with no lifting greater than forty pounds and gave plaintiff a zero percent (0%) permanent impairment rating. Mark Durlak, a physical therapist specializing in neck problems, agreed with Dr. Spillman's assessment of plaintiff's condition. Plaintiff continued to work at PPG in the bobbin salvage department.
16. Plaintiff returned to Dr. Curl in March 2000. At that time, Dr. Curl reviewed plaintiff's history and gave plaintiff a five percent (5%) permanent impairment rating to his neck and a five percent (5%) permanent impairment rating to his foot. Dr. Curl believed plaintiff could return to work and gave him permanent work restrictions barring use of his arms for repetitive or overhead work. At the time these work restrictions were given, plaintiff was offered the job of bobbin salvage.
17. Plaintiff continued to work in bobbin salvage, a job that fell within Dr. Curl's work restrictions. PPG offered onsite physical therapy to improve plaintiff's functional status; however, plaintiff refused to participate in these programs.
18. Plaintiff contends that he was unable to perform the bobbin salvage job because of his left foot problem. However, in May 2000, plaintiff sought treatment not for his left foot problem, but rather he contended his neck hurt too much to continue working.
19. Ultimately, plaintiff refused to perform the bobbin salvage job, contending that it violated Dr. Curl's restrictions for standing for his left foot. Plaintiff was then offered the rando job, which also fell within his work restrictions. The rando job was approved by Dr. Ritchie Lewis and consisted of guiding a board weighing less than ten pounds as it came off a machine. Plaintiff contends he refused the rando job on the basis that it required him to stand, in violation of Dr. Curl's restrictions.
20. Based upon plaintiff's report of foot pain beginning in October 1998, Dr. Curl could not say to a reasonable degree of medical certainty that plaintiff's left foot problem was caused and/or aggravated by his work at PPG.
21. Plaintiff's left foot condition is a non-work-related condition. Therefore, plaintiff's refusal to accept either the bobbin salvage job or the rando job in May 2000 was a refusal to accept suitable employment. Pursuant to N.C.G.S. § 97-32, plaintiff's refusal to accept suitable employment bars his right to any additional compensation.
22. On February 29, 2000, plaintiff established himself as a new patient at Davidson Internists with primary care physician, Dr. Stephen Hsieh, and his physician assistant, Ms. Margie Trent. Plaintiff continued treatment subsequently with Dr. Hsieh and Ms. Trent after they formed their own medical practice, High Rock Internal Medicine. On May 19 2000, plaintiff did not return to Dr. Curl for treatment for his neck or foot, despite Dr. Curl's offer for plaintiff to return at any time. Instead, plaintiff visited physician assistant Ms. Trent who gave him a trial of Oxycontin.
23. Despite having representation, plaintiff did not seek approval by the Industrial Commission at this time or at any time prior to January 2001 for Dr. Hsieh to become his authorized treating physician. Plaintiff has provided no explanation for a delay of nearly nine months before requesting approval for a change of treating physician from the Industrial Commission. Given Dr. Curl's availability to plaintiff, plaintiff's decision to self-direct his own treatment to his primary care physician is unjustified and is not approved.
24. Despite the offer of the bobbin salvage job, which clearly fell within his restrictions, plaintiff was also offered an alternative job at the rando position. Dr. Lewis believed plaintiff could perform the rando job. Plaintiff refused, and instead several days later contacted his primary care physician on May 31, 2000. At that time, despite not seeing plaintiff, Ms. Trent, the physician's assistant, agreed to provide an out of work note which she backdated to cover May 27 and May 30, dates which she had not seen plaintiff. Plaintiff followed up with Ms. Trent two days later and obtained an out of work slip lasting until June 6, 2000.
25. On May 29, 2000, physician assistant Ms. Trent removed plaintiff from work and he was placed on medical leave of absence from PPG and began to receive $300.00 per week from an employer-funded long-term disability plan. Plaintiff continued to receive these benefits for thirty-nine weeks.
26. Dr. Hsieh referred plaintiff to Piedmont Anesthesia and Pain Consultants physician Dr. Thomas S. Meloy. On July 5, 2000, Dr. Meloy noted his concern that plaintiff was taking the Oxycontin on a very inconsistent basis. This inconsistency, Dr. Meloy testified, caused him grave concern. Dr. Meloy kept plaintiff out of work until his next office visit.
27. On August 2, 2000, plaintiff told Dr. Meloy that he had been getting pain relief from his Oxycontin. Plaintiff's wife indicated that plaintiff had been taking the Oxycontin contrary to the express directions of the prescription. This again caused Dr. Meloy concern. At that visit, Dr. Meloy released plaintiff to return to work.
28. Plaintiff returned to work in the bobbin salvage position, but refused to stay at work. Instead, plaintiff contacted Dr. Meloy and told him that he was using heavy equipment and did not believe he should be taking narcotic medication. Based upon the representation that plaintiff was operating heavy equipment, Dr. Meloy had substantial concern regarding the safety of such activity, and wrote plaintiff out of work on August 22, 2000.
29. The reason plaintiff gave for his removal from work is not credible in that he was not operating heavy equipment and there was no basis for such a statement to Dr. Meloy.
30. On August 11, 2000, plaintiff returned to Dr. Hsieh complaining of neck pain and requested a disability form be completed so that disability insurance would pay off his truck loan. Despite only having examined plaintiff one time previously on July 6, 2000, Dr. Hsieh consented to complete the bank's disability forms for plaintiff.
31. After seeing plaintiff on only three occasions, July 6, 2000, August 11, 2000, and January 19, 2001, Dr. Hsieh wrote plaintiff out of work indefinitely beginning January 15, 2001, in a note dated January 24, 2001. In his January 19, 2001 office notes, Dr. Hsieh included that he also told plaintiff to explore permanent disability with DSS. Dr. Hsieh testified that he made the determination that plaintiff was permanently and totally disabled as of January 2001 without reviewing plaintiff's prior medical charts or speaking with plaintiff's other physicians.
32. The Full Commission gives Dr. Hsieh's testimony less weight than that of plaintiff's other doctors. Dr. Hsieh, at the time he had declared plaintiff permanently and totally disabled, had seen plaintiff on only three prior occasions. Dr. Hsieh acknowledged he is not an expert in orthopedics or neurological disorders, both of which were problems from which plaintiff contended he suffered. Dr. Hsieh had only been licensed to practice medicine approximately a year and a half when he saw plaintiff. Dr. Hsieh's failure to review plaintiff's prior medical history, view other medical records from the other treating physicians, and indication that such a determination could be of no value to him despite the fact that plaintiff's condition fell outside of his expertise renders Dr. Hsieh's opinion that plaintiff was and remains permanently and totally disabled without weight. Dr. Hsieh is the only physician of the approximately nine other physicians who saw plaintiff to declare him permanently and totally disabled.
33. In August 2000, at a time in which plaintiff contended he was too injured to return to work, plaintiff sought and obtained a crossbow hunting permit. Plaintiff's testimony that he did not use the crossbow or take a hunting trip is not accepted as credible given his indication to Ms. Trent in November 2000 that he had just returned from the mountains on a trip with friends.
34. Plaintiff continued out of work receiving $300.00 per week from the employer-funded disability plan. At the end of the thirty-nine weeks, plaintiff indicated his desire to return to work. Plaintiff was contacted by Brian McIlwain and offered the job of bobbin salvage once again. Mr. McIlwain indicated PPG would have, and it had in the past, taken steps to insure plaintiff's restrictions were followed.
35. Plaintiff again refused to accept this position of suitable employment, instead relying upon Dr. Hsieh's note to write him out of work and declare him permanently and totally disabled.
36. In January 2001, plaintiff saw Dr. Meloy at the Piedmont Anesthesia Clinic. As of January 11, 2001, several weeks before plaintiff was offered the job of bobbin salvage by Mr. McIlwain, Dr. Meloy released plaintiff to return to work. Dr. Meloy believed plaintiff could return to work and felt that plaintiff's failure to follow the prescription guidelines for the Oxycontin revealed the medication was not helping plaintiff as it should have. Dr. Meloy believed plaintiff should have stopped taking the medication.
37. Plaintiff did not reveal this information to Dr. Hsieh. Ms. Trent testified that had she known Dr. Meloy had released plaintiff to return to work, she most certainly would have brought this to Dr. Hsieh's attention as she believed it had bearing on whether plaintiff could return to work or was permanently and totally disabled as of January 2001. When presented with the evidence of Dr. Meloy's January 2001 note, Dr. Hsieh again disregarded another physician's recommendation plaintiff could return to work and stated he believed plaintiff was permanently and totally disabled.
38. Plaintiff's refusal to accept the job of bobbin salvage in January 2001 was an unjustified refusal of suitable employment.
39. On January 11, 2001, plaintiff filed a motion for change of treating physician and resumption of temporary total disability benefits requesting benefits from May 27, 2000 up to and including January 11, 2001. On February 28, 2001, Special Deputy Commissioner Gina Cammarano denied plaintiff's Motion. Plaintiff did not appeal from this administrative order.
40. Plaintiff has acknowledged not looking for work after Dr. Meloy released him to return to work. Plaintiff was released from his employment with PPG after his refusal to accept suitable employment. Plaintiff has failed to come forward with any credible evidence that he remains disabled as a result of his work-related injury and is unable to find work as a result of his condition.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury to his neck and left arm on May 24, 1998. N.C.G.S. § 97-2(6).
2. Plaintiff did not suffer an injury by accident or an occupational disease to his left foot, in that plaintiff failed to prove by the greater weight of evidence a causal link between his employment and his left foot injury. Plaintiff is entitled to no benefits for any disability arising from his left foot. N.C.G.S. §§ 97-2(6) and 97-53(13).
3. Plaintiff refused suitable employment as offered by defendant in May 2000 and again in January 2001. Specifically, plaintiff's refusal to perform the rando or bobbin salvage jobs was without justification. Plaintiff is not entitled to disability benefits pursuant to N.C.G.S. § 97-32.
4. To the extent plaintiff was unable to perform either the bobbin salvage or the rando job as a result of his left foot condition, plaintiff's disability was not caused by a compensable injury or occupational disease. Plaintiff is not entitled to any disability benefits after May 29, 2000 for temporary total disability. N.C.G.S. §97-29.
5. Plaintiff's motion for change of treating physician to Dr. Hsieh is denied. N.C.G.S. § 97-25.
6. Plaintiff retains a five percent (5%) permanent partial impairment rating of the back. N.C.G.S. § 97-31.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission AFFIRMS the holding of the Deputy Commissioner and enters the following:
 AWARD
1. For plaintiff's five percent (5%) permanent partial disability rating to his back, defendant shall pay plaintiff $353.72 per week for a period of fifteen weeks. This amount is subject to a credit for an attorney's fee as provided in Paragraph 2 of this AWARD.
2. An attorney's fee in the amount of twenty-five percent (25%) is approved as a reasonable fee for plaintiff's counsel and shall be deducted directly from the amount owed to plaintiff and paid directly by defendant to plaintiff's attorney.
3. Each side shall bear its own costs; however, defendant shall pay expert witness fees, if not already paid, as follows: $370.00 to Dr. Curl; $220.00 to Dr. Lewis; and, $340.00 to Dr. Rhyne.
This the ____ day of July 2003.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER